AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
03/09/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
March 9, 2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___KC___ DEPUTY

United States of America

v.

Jose Efren CIENFUEGOS,

Defendant(s)

Case No. 5:21-mj-00152

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date February 20, 2021, in the County of Riverside in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | See Affidavit |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
Complainant's signature

Donald R. Isaacs, FBI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: March 9, 2021

_____
Judge's signature

City and state: Riverside, California

Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Donald R. Isaacs, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Jose Efren CIENFUEGOS for violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Possession of 50 grams or More of Methamphetamine with Intent to Distribute).

2. This affidavit is also made in support of an application for a warrant to search two digital devices seized from CIENFUEGOS on February 20, 2021, and currently in the custody of Riverside County Sheriff's Department, Palm Desert California (collectively, the "SUBJECT DEVICES"), as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICES that constitutes evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession of a Controlled Substance with Intent to Distribute) and 843(b) (Use of a Communication Facility to Facilitate Drug Trafficking) (the "Subject Offenses"). Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest

warrant, and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Federal Bureau of Investigation ("FBI") Task Force Officer ("TFO") with the Los Angeles Division, Palm Springs Resident Agency ("PSRA"). I am an investigative or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

6. I am a Duly Sworn Peace Officer in the State of California and have been employed by the Riverside County Sheriff's Department ("RCSD") since August 2006.

7. I graduated from the RCSD's Basic Peace Officer Academy located in Riverside, California, in February 2007. Upon graduation, I was assigned to the Palm Desert Sheriff's Station located in Palm Desert, California, where I worked field patrol operations and special enforcement details. Street-level narcotics investigations were a part of my regular duties during those assignments.

8. In June 2014, I was promoted to Sheriff's Investigator and assigned to the Investigations Bureau of the Palm Desert Sheriff's Station, where I investigated crimes of violence,

sexual assaults, narcotics related crimes, and criminal street gang related crimes. I am currently assigned to the RCSD's Special Investigations Bureau – Major Crimes Unit, located in Riverside, California. As a part of that unit, I am currently assigned as a TFO to the FBI Desert Cities Safe Streets Task Force, Los Angeles Division, PSRA, located in Palm Springs, California. As a TFO, I investigate federal violations relating to gangs, firearms and drug trafficking, Unlawful Flight to Avoid Prosecution, violent crimes, crimes against children, human trafficking.

9. I have received a Bachelor of Science degree in Legal Studies from the American Military University.

10. I have participated in numerous criminal investigations; to include assaults, robberies, street and mid-level narcotics sales, illegal firearm offenses, criminal street gang related crimes, sexual assaults and death investigations during my tenure as a Peace Officer. I hold an Advanced Peace Officer's Certification from the California Commission on Peace Officers Standards and Training. Additionally, I hold a Robert Presley Institute of Criminal Investigation Homicide Investigation Certificate. I have attended training related to narcotics investigations, criminal street gang related crimes, crimes of violence, and other criminal investigations. In addition, my law enforcement experience includes conducting physical surveillance, and interviewing witnesses, victims, and suspects. Further, my law enforcement experience includes writing affidavits and serving search and arrest warrants.

Through my training and experience as a law enforcement officer, I have become familiar with narcotic trafficking and related crimes.

### III.  SUMMARY OF PROBABLE CAUSE

11. On February 20, 2021, members of the Coachella Valley Narcotics Task Force ("CVNTF") conducted surveillance at the Marriott Shadow Ridge Resort, in the city of Palm Desert to determine if CIENFUEGOS was staying at the location. CIENFUEGOS was on Riverside County Probation mandatory supervision with search terms for his conviction in Riverside County Case No. BAF1801222 for a violation of California Health and Safety Code section 11378, Possession of Controlled Substances for Sale. CIENFUEGOS was known to TFOs to frequent local hotels to sell controlled substances.

12. CVNTF members served a drug-related search warrant at the Marriott Shadow Ridge Resort, room #4129. During the service of the search warrant, CIENFUEGOS was detained walking to a car while carrying a black backpack. A search of CIENFUEGOS's backpack and his person revealed approximately 2,000 suspected Fentanyl or Oxycodone Hydrochloride 30 mg pills (approximately 267 grams), 748.3 grams of suspected methamphetamine (approximately 1.64 pounds), approximately 54.9 grams of suspected cocaine, approximately 66 grams of suspected heroin, two 90-count bottles of Farmapram (Alprazolam), $1,583 in United States Currency, and the SUBJECT DEVICES.

## IV. STATEMENT OF PROBABLE CAUSE

### A. CIENFUEGOS Leaves Drugs and a Rifle Magazine Behind at Hotel Rooms

13. I reviewed police reports and search warrants from CVNTF and RCSD, and I learned the following:

   a. On February 6, 2021, Riverside County Sheriff Deputies responded to the Mission Hills Villas Resort located at 71777 Dinah Shore Drive, Rancho Mirage, California. During the routine cleaning of hotel room 3811, housekeeping staff located a black bag containing approximately 45.5 grams of suspected M/30 Fentanyl or Oxycodone Hydrochloride 30 mg pills, approximately 33.5 grams of suspected cocaine, approximately 4.5 grams of suspected heroin, a digital scale, and $1,668 in United States currency. The property was turned over to RCSD.

   b. Hotel room #3811 had been rented by CIENFUEGOS on February 5, 2021, and CIENFUEGOS checked out of the room on February 6, 2021, at approximately 6:00 a.m. The black bag and its contents had been discovered by housekeeping staff during the room cleaning after CIENFUEGOS checked out.

   c. Later, on February 6, 2021, a male subject who verbally identified himself as CIENFUEGOS called the resort from telephone number (760) 886-5974 and told a hotel clerk he had forgotten a bag in the room and would return to the resort to retrieve it. However, CIENFUEGOS did not return to the resort.

   d. Corporal LOPEZ, a TFO assigned to CVNTF, interviewed the security manager at the Mission Hills Villas Resort where CIENFUEGOS had stayed. The manager told Corporal

5

Lopez that on a previous occasion when CIENFUEGOS rented a room at the resort, an AR-15 rifle magazine and ammunition were left in the room and discovered by housekeeping staff.

### B. RCSD Obtains a Search Warrant for CIENFUEGOS's New Hotel Room and Finds Him Carrying Drugs

14. I reviewed police reports and search warrants from CVNTF and RCSD, and I learned the following:

    a. Corporal LOPEZ tasked Sheriff's Investigator Villasenor with researching the telephone number (760) 886-5974 through law enforcement resources. Investigator Villasenor learned the telephone number (760) 886-5974 had service provided by T-Mobile with a subscriber listed as "Jose Castro." Based on my training and experience, I know that it is common for drug traffickers to conceal their identity by using pseudonyms when subscribing to mobile telephone service.

    b. Corporal LOPEZ was familiar with CIENFUEGOS from a previous narcotics investigation and knew CIENFUEGOS was on formal probation in Riverside County for being convicted of a violation of California Health and Safety Code section 11378, Possession of Methamphetamine for Sale, in Riverside County case number BAF1801222.

    c. During his investigation, Corporal Lopez learned CIENFUEGOS commonly moved around, living in hotels. The address listed on CIENFUEGOS' probation record was actually his parents' house. On February 11, 2021, Corporal Lopez authored a search warrant issued by the Honorable James T. Latting, Riverside

6

County Superior Court, for a mobile telephone ping of the telephone number (760) 886-5974.

      d.    Once Corporal Lopez began receiving the mobile telephone pings pursuant to the search warrant, he conducted physical surveillance in the areas of the telephone pings to locate CIENFUEGOS. Although Corporal LOPEZ did not locate CIENFUEGOS during those initial days of surveillance, the telephone pings led him to several hotels in the Coachella Valley of Riverside County. While conducting surveillance at those the hotels, Corporal LOPEZ saw white 2008 Ford Focus with California License Plate 6GVM306 around the pings. Corporal LOPEZ researched the vehicle through law enforcement resources and learned it had been driven in the past by Edgar Andrade, though it was registered to a seemingly unrelated female.

      e.    On February 20, 2021, Corporal Lopez received telephone pings at the Marriott Shadow Ridge Resort located at 4100 Rose Ridge Road in Palm Desert. Corporal Lopez sent TFO Earley to the Marriott Shadow Ridge Resort to locate CIENFUEGOS. TFO Earley gave a hotel clerk the telephone number (760) 886-5974. The hotel clerk confirmed that was the telephone number they had on file for CIENFUEGOS, but the clerk said that CIENFUEGOS was not listed as a guest at the hotel at that time. TFO Earley then asked the hotel clerk if Andrade, the driver associated with the white Ford Focus, was registered at the hotel. The clerk confirmed Andrade was a guest at the hotel and was staying in room 4129.

7

    f. Corporal Lopez and other TFOs with CVNTF then responded to the Marriott Shadow Ridge Resort to conduct physical surveillance. While on surveillance, Corporal Lopez saw the white Ford Focus arrive at the hotel and saw Andrade exit the vehicle. It appeared to Corporal LOPEZ that Andrade was the sole occupant of the vehicle. A short time later, Corporal Lopez saw Andrade and CIENFUEGOS exit room 4129 briefly and then re-enter the hotel room.

    g. Corporal Lopez then authored a search warrant, issued by the Honorable Judith Clark, Riverside County Superior Court, for room 4129, for the white Ford Focus, and for CIENFUEGOS's person. At 6:15 p.m., after Corporal Lopez obtained the search warrant, TFO Phillips saw CIENFUEGOS and Andrade exit room 4129 and walk toward the white Ford Focus. TFO Phillips saw CIENFUEGOS was carrying a black backpack. TFO Phillips initiated the service of the search warrant and detained CIENFUEGOS and Andrade in the parking lot.

    h. TFO Earley searched CIENFUEGOS pursuant to the search warrant. In CIENFUEGOS's right pant pocket, TFO EARLEY found:

     i. a small plastic bag containing a white powdery substance consistent in appearance, texture, and color with cocaine (11.3 grams gross weight);

     ii. $1,583 in United States currency; and

     iii. the SUBJECT DEVICES.

   i. Sergeant Gonzalez searched the backpack CIENFUEGOS carried.  Inside the backpack, Sergeant Gonzalez found:

    i. Two clear medium sized plastic bags containing round light blue pills imprinted with "M30" consistent in shape, size, and color with Oxycodone Hydrochloride 30 mg or Fentanyl pills (102.7 grams gross weight and 164.3 grams gross weight, for a total of 267 grams gross weight);

    ii. Two white plastic bags containing a white powdery substance consistent in appearance, texture, and color with cocaine (20.5 grams gross weight and 15.2 grams gross weight, for a total of 35.7 grams gross weight);

    iii. Two clear medium sized plastic bags containing a white crystalline substance consistent in appearance, shape, color, and texture with methamphetamine. (322 grams gross weight and 137 grams gross weight, for a total of 459 grams gross weight);

    iv. One white plastic bag containing a white crystalline substance consistent in appearance, shape, color and texture with methamphetamine (279 grams gross weight);

    v. Two clear plastic bags containing a white crystalline substance consistent in appearance, color and texture with methamphetamine (7.8 grams combined gross weight);

    vi. One medium sized clear plastic bag containing a dark brown rock-like substance consistent in appearance, color and texture with heroin (66 grams gross

weight);

    vii. One clear plastic bag containing a white crystalline substance consistent in appearance, color and texture with methamphetamine (6.3 grams gross weight);

    viii.   Two 90-count bottles of Farmapram (Alprazolam);

    ix.  One black functional digital scale; and

    x.   One black wallet containing, among other items, a California Driver's License bearing CIENFUEGOS's name and photograph.

    j.   When searching room 4129, TFO Angulo located a female adult, identified as Kaya Siva, inside of the bathroom. Corporal Lopez searched a backpack that Siva pointed out and identified as belonging to her.  Corporal Lopez located a small glass jar containing four light blue round pills imprinted with M30 inside the backpack.  The pills were consistent in shape, size, and color with Oxycodone Hydrochloride 30 mg or Fentanyl pills and with the pills found in CIENFUEGOS's possession.

    k.   TFO Angulo located Siva's wallet, which had contained a California Driver's License that bore Siva's name and photograph, in the bedroom of the hotel room.  Inside the wallet, TFO Angulo located a small plastic bag containing a white crystalline substance consistent in color and texture with methamphetamine (2.5 grams gross weight).

    l.   Throughout the hotel room, CVNTF TFOs found small amounts of substances and residue consistent with controlled substances and small amounts of money.  Based upon photographs I

10

reviewed, police report descriptions, and my training and experience, I recognized the condition of the room as consistent with room 4129 being used for the sale of controlled substances.

15.  Due to exposure risks, substances suspected of being or containing Fentanyl were not field-tested.  Based upon Corporal Lopez's training and experience, Corporal Lopez was aware of the current drug trend of traffickers to counterfeit Oxycodone Hydrochloride 30 mg using Fentanyl.  Samples of the white crystalline substance and dark brown rock-like substance were tested separately using presumptive field tests.  The white crystalline substance sample presumptively tested positive as methamphetamine.  The dark brown rock-like substance sample presumptively tested positive as heroin.  Based upon Corporal Lopez's training and experience, he believed the crystalline substance to be methamphetamine, the dark brown rock-like substance to be heroin, the round light blue pills imprinted with "M30" consistent to be Oxycodone Hydrochloride 30 mg or Fentanyl, and the white powdery substances to be cocaine.  I reviewed photographs of the substances, and, based on my training and experience, I agree with Corporal Lopez's determinations.

16.  In my training and experience, given the amounts and varying types of the suspected controlled substances involved, the amount of cash located on CIENFUGOS' person, the two mobile telephones phones located on CIENFUGOS' person, the condition of the hotel room, and CIENFUEGOS's prior drug-trafficking

conviction, I believe that he possessed the controlled substances intending to distribute them.

### IV. TRAINING AND EXPERIENCE ON DRUG OFFENSES

17. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their mobile telephones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from mobile telephones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In

addition, it is common for people engaged in drug trafficking to have photographs and videos on their mobile telephones of drugs they or others working with them possess, as they frequently send these photographs to each other and others to boast about the drugs or facilitate drug sales.

        d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.   Drug traffickers often keep firearms for protection in connection with their drug trafficking activity. Drug traffickers are often reluctant to rely on law enforcement when they are the victims of crime in the course of their drug trafficking because doing so would entail admitting to their own illegal activity, so they often rely on firearms to protect themselves.

        f.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

18. As used herein, the term "digital device" includes the SUBJECT DEVICES.

19. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   e. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   f. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

   g. Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

15

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

20. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

21. For all the reasons described above, there is probable cause to believe that CIENFUEGOS has committed a violation 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Possession of 50 grams or More of Methamphetamine with Intent to Distribute).

22. Additionally, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant, FBI TFO Donald R. Isaacs, in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  9th  day of  March , 2021.

_____
UNITED STATES MAGISTRATE JUDGE

16